Dargan, Ch.
delivered the opinion of the Court.
On the 12th of April, 1820, Thomas G. Jaggers executed, in favor of Elizabeth Jaggers, an instrument of which the following is a copy:
“South Carolina. Know all men by these presents, that I, Thomas G. Jaggers, of the District of Chester and State aforesaid, for and in consideration of the love, good will and *355 affection which I have and do bear towards my sister, Elizabeth Jaggers, of the District of Chester and State aforesaid, do give and make over one woman and child, named Polly and Joe, unto the aforesaid Elizabeth Jaggers, her heirs, executors or administrators or assigns, the above negro woman and child, with her increase, to the said Elizabeth Jaggers, and her heirs of her begotten, forever, in as ample and full a manner as I am capable of bestowing : to have and to hold the said negroes, Polly and Joe, unto the said Elizabeth Jag-gers, her heirs and assigns, from henceforth and forever, as her lawful right and property, at my death. In witness whereof, I have hereunto set my hand and seal, this 12th day of April, in the year of our Lord, one thousand eight hundred and twenty, and in the forty-fifth year of the Independence of the United States of America. Signed, sealed and delivered in the presence of us.
(Signed) Thomas G. Jaggers. [l. s.]
“ Test witness — John P. Roden, Caleb Davis.”
There was some question raised as to the delivery of this deed, which will be disposed of hereafter. But the first question to be considered and adjudged, is this : assuming that the deed was duly delivered, what estate, if any, does it create in Elizabeth Jaggers ? And this will involve the enquiry, whether, by the laws of South Carolina, it is corn- *356 petent for any person, on the consideration of love and affee-tjori¡ ¿ee¿ or other writing, properly and duly executed and delivered, to create in personal chattels, an estate, or future interest, to take effect, or vest in possession, after the termination of a life estate, reserved by the donor to himself in the same deed or writing. The Chancellor who heard this case on the circuit, after a very careful and elaborate examination of the subject, decided the above stated proposition in the negativo. As the result of his argument and review of the authorities, in the conclusion of his decree, he expresses himself in the following language: “Although a chattel interest may be created to commence in futuro, it must not be at an indefinite time, such as the death of the donor, unless founded on a valuable consideration: when the consideration is love and affection, and the event on which the gift is to take effect, is the death of the grantor, these circumstances place the parties and the property exactly in the condition of a will, and not of a deed — nothing is actually given or received. It cannot be a gift inter vivos, as neither possession, title or property passes any more than by a will, which the maker may make when he pleases.” Carrying out this view of the subject, and this construction of the deed, the Chancellor holds that, supposing the deed to have been duly delivered, Elizabeth Jaggers could take nothing under it, and dismisses her bill, which had been filed against the defendant *357 for the specific delivery of the negroes. And this is a motion to reverse the decree, on the ground “ that the instru-^ ment of writing in question, after being signed and sealed by the maker, Thomas G. Jaggers, having been also duly delivered by him to the donee, the complainant, according to the true meaning and construction thereof, a present vested interest in the slaves therein named, passed irrevocably to the donee, to be enjoyed in futuro, the same operating as an irrevocable deed, and not as a mere testamentary paper; and the subsequent possession of the sjaves by the maker, having been according to the provisions of the déed, the complainant was not barred either by the Statute of limitations, or by length of time.” The complainant’s ground of appeal substantially embraces the same question' which I have stated in a more abstract form in the beginning of this opinion.
It has been vehemently urged in support of the opinion which the Chancellor has delivered in his circuit decree upon this interesting question, that it is entirely in accordance with the principles of the common law, and the decisions of our own Courts, and that a different decision by this Court would be a mischievous, if not dangerous violation of the established law of the land. A majority of this Court are of the opinion that the circuit decree must be reversed, on the ground that, upon the question stated, it is not in accordance with the law of South Carolina. And as the duty has been *358 imposed upon me of expressing their judgment, it will be necessary that I should review and examine the course of our own decisions on the subject. And as a preliminary to this review, I will remark that it may be conceded, without in the slightest decree invalidating the opinion of the majority of this Court, that their judgment in this case is not in accordance with the ancient principles of the common law.
There are many principles recognized as law in South Carolina, as well as in England, not founded upon Statute, that are diametrically opposed to what was considered the well-established principles of the common law. It is a system of law, resting for its authority upon usages, and these usages are evidenced by judicial interpretations, and the decision of cases brought before the Courts for adjudication.— From such a system, we must naturally look for mutations, and even revolutions, in the judicial .exposition of the law. — ■ Upon such a code it would be unreasonable to expect that the changing features of each succeeding age would not be characteristically impressed. ' The common law has ever been admitted to possess a remarkable flexibility, which renders it capable of being adapted to the ever varying wants of a progressive civilization, in matters too minute or unimportant to call for legislative action. Upon the principle of obsoletism (if I may use the expression) it drops, or throws off by its .own inherent energy, that which the progress of *359 society has rendered useless or inexpedient, and by the same vital force it eliminates new principles, and developes extensive branches of jurisprudence, which are found in the an-' cient system, if there found at all, only in a rudimental state. The common law of early times was the code of a semi-civilized people, in a state of military subjection to feudal chiefs, with little wealth and few wants. It was then as rude as their own-manners, or their own early gothic monuments. What is it now? Avast system of jurisprudence, admirably adapted to the necessities of a great, powerful and. wealthy people, possessed of a commerce, and boasting' a refinement and civilization, which surpasses that of any other people of any other age of the world. Ponderous in its pre-portions, it is yet perfect and complete in its finish; alike adapted to the greatest exigencies and interests, as well as to the minutest wants of society. How lias this vast and complicated system been built up? In the progression of ages, mainly by what is opprobriously termed judicial legislation. Thus it is that the common law of to-day, is not that of fifty years since. Nor that of fifty years since, the common law of the preceding century. Nor is the common law of South Carolina always that of the mother country. It has, in many particulars, received a ne.w impress and a new direction from our peculiar circumstances, habits and institutions ; and it would be absurd to say that we are under any *360 obligation to follow the decisions of the English Courts with blind submission.
Manning’s case, 8 Co. 95 Lambeth’s case. 10Co.46
The flexibility of the common law cannot be better illus» trated than by a reference to its course upon the very question which we are now considering. It cannot be doubted, that by the early common law, a future estate in chattels could not be created either by deed or by will. The possession and the title went together. The possession drew after it the title, and he who was entitled to the possession, was regarded as the owner of the fee. This rule answered very well for a rude people, possessing but little personal property, and regarding real estate as of paramount importance. 'But with commerce, manufactures and the arts, came a vast increase of the quantity and value of personal property. And in the wants and refinements of a highly civilized and complex social state, it was felt that this strict rule of the common law was inconvenient in its operation. Then commenced those innovations of which I have spoken. It had been settled in the times of Lord Coke that chattels real might be limited by will. But as yet, the common law allowed of no limitation of a chattel personal, and a gift to one for life, ¡.carried the absolute estate, or interest. Then a distinction was taken between the use of a chattel, and the property, and it was held that the use might be given to one for life, and the property afterwards to another; the legal estate being *361 supposed in the mean time to remain in the executor of the testator. The Courts, perceiving the inaptitude of this rule to the wants of society, and still struggling to free themselves from its embarrassment, went further, and held that future interests in chattels might be created by executory devise; and after the introduction of uses into the common law, (itself also an innovation,) they held that limitations of chattels might also be created by way of trusts. And at length Sir William Blackstone, writing in the latter part of the 18th century, informs us that all these distinctions are now disregarded, “and therefore,” he observes, “ if a man, either by deed or will, limits his books or furniture to A, for life, with remainder to B., the remainder is good.”
2 Bl. Com, 398.
2 Brev. Rep, 355.
After this authoritative declaration of the learned and illustrious commentator, as to what was the received rule of the common law acknowledged and administered in Wesminster Hall, at the publication of his Commentaries, it is not with a little surprise that we turn to our own reports and find our Courts in 1810, in the case of Cooper v. Cooper, still clinging to a doctrine which had long before been repudiated by the English Judges themselves, and holding that a limitation by deed of a chattel, after the termination of a life estate in the same, was not valid; at the same time scoffing at the unreasonableness of the rule that bound them, and deploring the necessity of adhering to it. Four years after the decision of *362 Cooper v. Cooper, that learned and distinguished jurist Chancellor DeSaussure, asserted an entirely different doctrine in Stephens v. Tucker, deciding, by a Circuit decree not appealed from, that a limitation by deed of slaves to one for life, and after her death to issue, was a valid limitation to the issue. And I will here remark that the case of Cooper v. Cooper appears t0 ke the earliest case in this State, so far as I have been able to discover, in which a contrary doctrine has been asserted. And it does not appear to have any support in the history of our early jurisprudence. For in the case of Dott v. Cunnington, decided in Jan. 1795, and Stockton v. Martin, decided, in Jan. 1802, it seems not to have been disputed but that the doctrine which we have seen Sir Wm. Blackstone acknowledging as the rule which prevailed in Westminster Hall in his day, was the law of South Carolina. For, on the implied but strong sanction of these early cases and others, we find Chancellor Johnson, in Powell v. Brown, denying the authority of Cooper v. Cooper, and on the question whether a remainder in a personal chattel could be created by deed to take effect after a precedent life estate in the same, deciding that such a limitation was valid. The following is his emphatic language: “ I take it, therefore, to be well settled, whatever may have been the rule in England, that here a limitation over in a personal chattel may be created by deed, otherwise than by a conveyance to uses.” In perfect accord-anee with this language, is that of Judge Nott, in Duke v. Dyches. I will hereafter advert to this case in another branch *363 of this discussion. I refer to it in this connexion for the purpose of shewing how perfectly the opinion of that eminent Judge harmonizes with that of Judge Johnson in Powell v. Brown. The former asserts, that whatever may be the rule in the English Courts as to limitations of chattels, it was changed in South Carolina as far back as 1794, or rather that it was never recognised in this State at any period, and that from that time such limitations have been supported by the decisions of our Courts.
4 E<p R. 5 3.
2i?ay’/m3' ay' '
l Bail. R. 100.
Not reportea,
2 Hill, 543.
The next case which I shall notice is that of Brummett v. Barber, decided in 1834. Here the donor undertook by pa-rol to give a life estate to his neice, with a remainder over on her dying without leaving issue. Assuming (as well settled,) the principle that such a limitation by deed would be valid, the Court proceeds to discuss the question whether a valid limitation over, after the determination of a precedent life estate, might not be created by parol; deciding that question in the affirmative. Judge O’Neall, in delivering the opinion of the Court, uses the following language : “ there is nothing to prevent a trust in personal property from being created by parol, either written or unwritten, and that, even without resorting to the doctrine in relation to trusts of personal property ; as it was clear that any thing that was good and effectual in law to pass personal property, was equally so to limit it.” This, in my conception, applied the finishing stroke, in *364 the utter demolition of-the rigorous principle of the old Common Law, that did not allow limitations of personal property. In the case of Hill v. Hill, (decided in 1837,) the donor by deed conveyed slaves to his four children, and in case any of them died without issue, then to the survivors or sur-VFV01'- The limitation was held valid, and I refer to it here, only for the purpose of completing my analysis of this class of the cases on this subject, which have been decided by our Courts.
But why, it may be asked, introduce in this opinion a notice of the foregoing cases? as they only prove what the Chancellor distinctly admits in his decree, “ that a chattel interest may be created to commence in futuro.” My object is two-fold. First, to present a brief review of the whole course of adjudications on this subject in South Carolina, and secondly, to shew to what a small extent the ancient maxims of the Common Law ha.ve prevailed on this question from the earliest times to the present; and how far Judge Nott was supported in the opinion which he expressed in Duke v. Dyches, that this principle of the common law has not prevailed in South Carolina since 1794, if it ever was recognised at all.
But the Chancellor, distinctly admitting that “ a chattel interest may be created to commence infuturo” proceeds to say “it must not be at an indefinite time, such as the death of the donor, unless founded on a valuable consideration. When *365 the consideration is love and affection, and the event in which the gift is to take effect is the death of the grantor, these circumstances place the parties exactly in the condition of a will, and not of a deed; nothing is actually given or received.” From this quotation it appears to be the opinion of the Chancellor, that even where the donor intends to do an irrevocable act, and to make a deed of personal property, couched in proper words to pass the title to the donee presently, but not to take effect in possession until the death of the donor, and although the deed may have been duly delivered, the reservation of a life estate in the donor, or in other words the postponement of the enjoyment of the donee until the death of the donor, constitutes the act as testamentary, and renders it void as a deed. The Chancellor admits that precisely such a deed would be valid, if founded on a valuable consideration. What difference could there be between deeds for love and affection and for valuable consideration, to take effect at the death of the grantor, arising from the objection as to there being no delivery of possession ? The possession of the property could not be delivered in either case. And yet in the one case the deed is admitted to be valid, and in the other it is not. Here is a distinction, the foundation of which I am unable to perceive. Again: If it be conceded that a chattel interest can be created to commence in futuro, why may it not be made to commence at an indefinite period, or *366 upon a contingent event. I know of no reason why A. should not for a valuable consideration convey a title in his slave to B. with a condition that the possession should be delivered at a future time; in one, or ten years, or upon some future contingent event; upon the death of some third person, or that of the vendor. And is there, I would ask, any difference between executed conveyances of property founded on valuable consideration, or that of love and affection, except as to the rights of creditors? In both of these classes of cases the title passes tinder the same forms and ceremonies.
But it is objected that where the donor reserves a life estate in himself, as in the case of Jaggers’ deed, there can be no delivery of the possession ; which, it is urged, is indispensably necessary to pass the title to personal property. I will not pause here for the purpose of shewing, what has already been hinted at, that the objection applies with equal force to conveyances of future interests in chattels founded on a valuable consideration. Butl apprehend that I am well supported by authority in saying that where there is a deed or writing conveying the title, no delivery of possession of the chattel is necessary to the perfection of the title. In such cases the delivery of the deed or writing passes the title, and is a substitute for the delivery of the property. In all other cases, tradition, actual or symbolical, is necessary. Chancellor Kent, after commenting upon this last proposition, remarks, “ it is *367 nevertheless assumed m ancient and modem cases, that a gift of a chattel by deed or writing, might do without delivery.” In Ross on Vendors, 197, it is said that “ the property in goods passes by the delivery of the deed.” In Noy’s Maxims, 107, “If a deed be made of goods and chattels and delivered to the use of the donee, the property in the goods and chattels is in the donee presently.” In Irons v. Smallpiece, Ch. J. Abbott says, “1 am of opinion that by the Law of England, in order to transfer property by gift, there must be either a deed or written instrument, or there must be an ac tual delivery of the thing to the donee.” And in Youngs More, it is decided that the delivery of a deed of chattels to the donee vests the property in the donee without a delivery of the possession.
to Law Lib. 1 '
rn & argg2 l Strob. L. R. 53>
2 Bailev 588 Riley, 290.'
I will in the next place proceed to discuss another branch of this question, and to consider how far the distinctions taken in the decree of the Circuit Court are sustained by authority, and this discussion will involve the review and analysis of another class of decisions on this subject. And in the first place I will dispose of Pitts v. Mangum, and McGinney v. Wallace, both of which are quoted in the Circuit decree in support of the views there taken. In my opinion these cases are not pertinent to the question arising under the deed of Thomas G. Jaggers. They are both cases in which the donor attempted by parol to give a slave to the donee, reserving *368 to himself a life estate. Both these cases (as it will be seen (by reference to them) turned upon the question of delivery, 'it was ruled, with great propriety and with unanswerable logic, that there could be no such thing as a parol gift of a chattel to commence in futuro. In the first of these cases Judge O’Neall rerharks, “ in order to constitute a gift by pa-rol there must be a delivery of possession with a view to pass a present right of property. There can be no such thing as a parol gift to commence in futuro.” It will be observed, that there is no intimation of an opinion here, that the gift of a chattel in writing to commence in futuro might not be valid. And in the case of McGinney v. Wallace, Judge Richardson who tried the case says, “ the donor transferred no dominion or exclusive control of the slave to the donee, but kept it to himself, and left no room for a constructive delivery by the reservation of his life estate. All parol gifts” he proceeds to observe, “require to be perfected by delivery, ora transfer of the donor’s control over the thing given.”
These cases have no bearing whatever on the question now befoie the Court, at;d serve only to qualify, and they properly qualify the doctrine of parol limitations of chattels, as laid down in Brummett v. Barber.
I come now to consider the case which may be regarded as the pivot on which the decree of the Circuit Court was made to turn; the source, I apprehend, of all the difficulty, *369 misconception and error, with which this subject has been invested; the case of Vernon v. Inabnit. I differ with the counsel for the appellant in the opinion which he so emphatically expressed, that what Judge Brevard said on this question was a mere obiter dictum. True that the Statute of limitations was also involved, but on account of the infancy of the plaintiff, the view which the Court took of the law as to the limitation of the chattels became highly important to the issue of the case. One John Vernon, by a deed bearing date in 1788, gave a female slave (the mother of the negroes in dispute) to his minor son James Vernon in fee, reserving to himself a life estate. The case came on for trial in 1810, the same year in which Cooper v. Cooper was adjudged, and it is a striking fact, that both cases were decided upon the same general principle, to wit: that the law did not admit of the limitation of a chattel except by will, or deed of trust; a principle which I have already shewn was exploded even in the English Courts long before that period. “ It is settled law,” says the Judge, “that a man cannot limit a personal chattel to one for life and remainder to another, except by will or deed of trust. In the first case the property passes by way of executory devise; and in the second it vests in the trustees for the uses and purposes declared in the deed. Now if a life estate in a chattel cannot be carved out by deed, without the intervention of trustees, with what propriety can it be *370 contended that si man can carve out of a chattel interest, a life estate for himself, and convey the remainder” to another, &c. The postulate being conceded, the reasoning is unanswerable, j}ut ^ error consists in the fact, (to speak in the language of the school-men,) that the major proposition is untrue, to Wit, “ that a man cannot limit a personal chattel to one for life, remainder to another, except by will or deed of trust.” But suppose the proposition to be reversed, and that it be conceded that a future interest in a chattel may be created by a deed without the intervention of trustees, and to commence at a future and uncertain period, (and this is undeniably the law,) would it not follow from any thiug in reason to the contrary, that the grantor might and should be allowed to make that future interest vest as to the period of possession on the ter-ruination of his own life, as well as upon any other future event ? This decision, then, does not sustain the distinction taken in the Circuit decree, which, admitting that a future interest in a chattel can be created otherwise than by will or deed of trust, denies that the grantor can retain in such chattel a precedent life estate to himself.
4 McC. L. R. 198.
The case which approximates nearest to Vernon v. Inabit, is Ingram v. Porter. This case has always appeared to me to be of an anomalous character. The donor granted to his daughter a slave in words conveying the fee, with a ha-bendum that restricted the commencement of her possession and enjoyment to the period of his death. The final judgment of the Court was, not as in Vernon v. Inabnit, that the *371 remainder was void, but that the life estate reserved to the donor was void, and that the donee took the entire estate; on the very technical ground that the habendum was repugnant to the premises of the deed. Apocryphal as‘is the authority of this case on this point, it is the only one I have been aWe to find in our reports, that does support the distinctions taken in the decree. I have already shewn that Pitts v. Mangum, and McGinneij v. Wallace do not. I will now proceed to shew that two other cases cited for that purpose fall equally short of furnishing the analogy that they are supposed to present. In the first of these, Ragsdale v. Booker, decided in 1826, and which is not reported, no question was made as to whether a future interest in a chattel can be created, or whether the donor could convey a chattel to a donee, reserving to himself a life estate. I write with a copy of the decree of the Court of Appeals before me, and I say, that no such question was considered by the Court. Judge Nott in delivering the opinion says, “ the Court do not deem it necessary to go into a consideration of any of the grounds taken except the third, which is the following. Because the deed under whjch the complainants claim, is a testamentary paper, and vests no legal interest in the complainants until the death of John H. Ragsdale.” The form of the deed is the same as given in the Circuit decree. The Court proceeds to discuss *372 the question involved in the third ground of appeal, and pro-nounocs ^he instrument to be testamentary, laying much stress on the fact, that it was not delivered. But nothing in tjiat jn¿grneri(; wi)l be found to support the doctrine, that a man may not by a deed couched in proper and apt words, convey a future interest in a chattel to vest in possession on his own death.
i Speers’ Ea. ne. 1
The same remarks apply with peculiar force to the case of Welch v. Kinard, which has been cited with great confidence in support of the view of the question opposed to the conclusion of the majority of this Court. The form of the instrument is given in the Circuit decree, and need not be here repeated. Chancellor Johnson who tried the case observes, “the case of Ragsdale v. Booker is in principle this case.” But he goes on to observe that “ the same question again came up in Duke v. Dyches, on a deed to the same effect, differing something in phraseology.” And losing sight of the fact that the instrument in Ragsdale v. Booker was held to be testamentary, and that in Duke v. Dyches it was held to be a deed, he proceeds to decree a delivery of the negroes to the complainant, who was the donee.
On appeal the decree -was reversed. The whole question discussed and decided by the Court of Appeals, was whether the instrument was testamentary, or a deed. Chancellor *373 Harper in delivering the opinion of the Court says, “ the case of Ragsdale v. Booker, cited, by the Chancellor, appears to us, as it did to him, to be in point. It is supposed, however, to be overruled by that of Duke v. Dyches, apart from the consideration, that the words in that case import the passing of a present interest or estate; ‘ I have given and granted and by these presents do give and grant;’ and in the present case purport to give nothing till the testator’s death.” And on this distinction the instrument is adjudged to be a testamentary paper. But it is manifest, and highly pertinent to the present issue, that the authority of Duke v. Dyches is fully and distinctly recognised both by the Circuit decree and in the opinion of the Court of Appeals.
Having now disposed of all those cases which have been supposed to support the opinfon of the Chancellor, I will, in the next place, present a rapid review of that series of cases which sustain, and in my judgment establish on impregnable grounds, the opposite opinion. The array of cases is strong, and if the doctrine of Vernon v. Inabnit ever was the law, they are sufficient to overthrow and overrule it. .
Taking these cases in their chronological order, the first is Duke v. Dyches, to which I have already, several times, adverted in the preceding remarks. It was decided December term, 1829, and is not reported. It was an action of trover, by the executors of Duke, for the recovery of certain negroes *374 that had, by deed, been given and granted by plaintiff’s testator to his natural daughter, Esther Benson, “to be and remain as her proper right and property at the death of the said Moses Duke,” &c. The remainder to Esther Benson was sustained by the unanimous opinion of the Court. The Chancellor, in his decree, in the present case, with the view to weaken the force of this decision, observes : “ the Court held the limitation to be good, but did not decide whether the instrument was testamentary; that question does not appear to have been made, but as the case occurred since 1824, doubtless it was considered as a deed.” I refer to this observation for the purpose of saying, that throughout the whole opinion of Judge Nott, the instrument is considered as a deed. In the very statement of the question, it is treated as a deed. “ The only question,” says he, “ now submitted to us, is whether personal property can be limited over by deed to take effect after the termination of a life estate.” In Trotti, executor, v. Dyches and others, which was a case in equity before Chancellor DeSaussuhe, and was brought before the Court of Appeals at December term, 1828, the same question ’ on this identical instrument was decided by the Chancellor. On a question made by the widow of Moses Duke, to reduce the provision made for his illegitimate daughter, Esther Benson, under the Act of 1795, it was of importance to determine the character of this instrument.— *375 It was executed before Duke was married. If it was a deed it escaped the operation of the Act of 1795. But if it was testamentary, the property given to Esther by it was to be taken into the estimate, in reducing her legacy under her father’s will, to the one-fourth of the clear value of his estate. The question, was distinctly made, and Chancellor DeSaus-sure says “it was clearly intended to be a deed of gift, and not a testamentary paper ; yet the enjoyment of the property was not to take effect until the death of the testator, or sooner if he chose it.” He proceeds to decide that the deed having been executed in 1804, when the donor had neither wife or lawful child, he had consequently a clear right to make a gift to his bastard child. The defendants appealed from this decree, among other grounds, on the following: “ Because the deed of 1804 is either void, or inoperative as a testamentary paper, and revoked by the subsequent will.” This ground appears to have been abandoned by the counsel, as it does not appear to have been discussed in the judgment of the Court of Appeals.
The next case to which I refer is Harris v. Saunders, decided at Columbia, Spring Term, 1835. The case is not reported. It was trover for a negro, which was alledged to be a gift from the plaintiff’s putative father. The deed was lost, but a witness on the trial proved that he had drawn the deed, and that it was a deed from John Harris to the plaintiff *376 for the negro, in which he, John Harris, reserved to himself a life estate. There were various questions made, and among them that of delivery of the deed. But die case did not, as was observed by Chancellor Harper in Welch v. Kinard, turn upon the question of delivery. But the question as to the testamentary character of the instrument was distinctly submitted. The fourth ground of appeal was that the instrument was revocable. Judge Earle in delivering the opinion of the Court of Appeals, on this question, observes: “ Nor does there appear to be any reason for regarding the paper as testamentary and revocable. All the evidence tends to establish the paper as a deed. It was executed as a deed, published and recited as a deed, and the transaction was always referred to as an actual gift to the plaintiff.”
The next case which I will cite is the unreported case of Sunday v. Boon, decided by Chancellor Johnston, at Edgefield, June Term, 1836. In this case Mary King, by deed, in consideration of natural love and affection, “granted and sold” to her children, who were named, all her real and personal estate, to have and to hold the same, &c. “fromhence-forth and forevermorewith a provision that the grantees should permit her to use all the property thus conveyed, “ during her natural life, without paying or yielding anything for the same.” The deed goes on to provide that, at her *377 death, the children should have and enjoy the estate, “ and dispose thereof to their own proper use and behoof as they shall see fit.” This instrument was held by the Chancellor not to be testamentary, that it was valid, and could not be discharged of the trusts therein created by a subsequent deed inconsistent therewith; which decree was unanimously affirmed by the Court of Appeals. It may be remarked en passant, that this case does not appear to be so directly to the point as some of the others, as the instrument may be regarded as a deed of trust, conveying the whole fee directly to the children, and charging it with an equitable estate in the donor for her life, according to the reservations of the deed.
Rice Eg. 243.
The next and last in this series of cases is that of Dawson v. Dawson, decided in 1839. It has been asserted that this case has no application to the question, but in my judgment there is no case in the books which has a more important or direct bearing on the subject. Dawson, the elder, made a will which was duly executed on the 2d May, 1820, and was subsequently modified by a codicil. On the 3d June, 1821, he executed a very unique and informal instrument, which was held to be a deed, and to have been duly delivered.- By this deed he says, I give to my named children, in my will, all my real estate and all my porsionai propity and goods and chattels to my named children in my will, and I do aeknolege this day to be them and no others then those *378 that are named in my will, and the use therin menshend. I appoint Captin Thomas Dawson in trust to the same. I give up all I have.” Richard Dawson, senior, lived some 18 years afterwards. The Chancellor, who tried the case, decided that the provisions of the will were incorporated in the deed, gnd that the joint effect of the two taken together, was to reserve to the donor a life estate, with a remainder to the children, named in the will. Hear the language of the Chancellor on this question : “ Can the paper,” says he, “ operate as a deed ? I shall not, after the decisions that have been made in this State, trouble myself by enquiring whether a present vested interest, to be eujoyed in futuro, can be directly conveyed by deed, either as to realty or personalty.— That is a settled question. That is precisely the character of this instrument. The title passes now by thedeed, to take effect m enjoyment at Mr. Dawson’s death, according to the provisions therein referred to. Himself to stand seized in the mean time.” The decree was affirmed by the Court of Appeals.
I have now .reviewed the whole course of our adjudications on this subject, and it appears to me that there is a perfect harmony among all of them, from the earliest times to the present, with the exception of the cases of Cooper v. Cooper, Vernon v. Inabnit, and the somewhat anomalous case of Ingram v. Porter, in which three cases the decision was placed, as I have shown, upon the untenable, exploded and now confessedly erroneous doctrine, that a future interest in a chattel could not be created by deed at all, except by way of trust; for which reason alone those cases are not entitled in any sense to be considered authoritative. The result of all the cases may be summed up in a few general propositions, to wit: That a future interest in a chattel can be created by deed otherwise than by trust, and even by parol; that a person can, by a deed duly delivered as such, give to aqother a chattel, reserving to himself therein a life estate; provided, that by the operation of the deed a present title passes in the chattel to the donee, with the right of future enjoyment. But in the case of parol gifts, cm account of there being no delivery of dominion over the chattel, or of a deed or title as a substitute therefor, one cannot, by parol, give a chattel to another, reserving to himself a life estate.
In all cases like the present, where the donor by an instrument in writing gives personal property to another, reserving to himself a life estate, or providing that the interest of the donee shall commence at his death, the first enquiry must necessarily be, whether the purpose was to make a deed or a will. If it appears from a construction of the whole instrument, that the donor intended to do an irrevocable act, and to pass a present title to the property, deferring only the enjoyment of *379 the donee to the period of his death, then it is to be consid-cred as a deed, and will have an operation as such, and the remainder to the donee will be valid, and take effect in possession according to the provisions of the deed; providedA always, that the instrument be duly delivered.
Such, I am authorized to say, is the opinion of the majority of this Court. And the majority of this Court is further of .the opinion, that the deed of Thomas G. Jaggers, by which he conveys the slaves in question to the complainant, Elizabeth Jaggers, reserving to himself a life estate, if the same was duly delivered, is a good and valid deed, and that the effect thereof was to pass a present title to Elizabeth Jaggers of a future interest — a life estate being reserved to the donor. It is therefore ordered and decreed, that the decree of the Chancellor, on the construction of the deed of Thomas G. Jaggers to Elizabeth Jaggers, be reversed. But inasmuch as the evidence, in regard to the due delivery of the said deed, is not entirely satisfactory, the case is remanded to the Circuit Court, for the purpose simply of trying the question as to the due delivery of the said deed.
Dunkin, Ch. Richardson, J. Evans, J. and Frost, J. concurred.
JOHNSTON, Ch. being interested in the question, gave no opinion.

Decree reversed.

[Note.] The three cases of Ragsdale v. Booker, Duke v. Dyches and Harris v. Sanders, so often referred to in the progress of this ease, and not heretofore reported, will he found in this note. The two first were decided when the Court of Appeals consisted of three Judges, who were at that time, the Hon. Abraham Nott, the Hon. Charles Jones Colcock and the Hon. David Johnson.

S. N. Ragsdale et al v. Thomas Booker.

An instrument of writing by which the donor, in consideration of natural love and affection, gives certain, slaves to be equally.divided among allhis children, at Ms death, but which does not profess to have been delivered — was held to be a will and not a deed.
A testament is tire legal declaration of a man’s intentions, which he wills to be performed after his death, (2 Blk. Com. 500.)
Befare Thompson, Ch. at Union, May Sittings, 1826.
Thompson, Ch. — The bill stated that, on the 23d March, 1816, shortly after the death of the complainants’s mothir, their father, John H. Ragsdale, in order to make some certain and adequate provision for them and their brother James H. since deceased, and in order to secure to them the property which he had received in *349 marriage, be, at that time, being perfectly free from and clear of debt, and being possessed of considerable other property, in consideration of parental love, good will and affection, by bis deed, duly executed, gave to the complainants and their brother J ames, the following negroes, which he received in marriage with their mother, to wit: — a negro woman named Eda and her t .ree children, Malinda, Hannah and Mary, with all their future increase, to be equally divided between them, reserving to himself a life estate in them. Since the execution of the said deed, the said negroes have had increase as follows — Eda has had three children, their names unknown, and the negro woman, Malinda, one child, whose name is also unknown. Sometime in the year 1820, the said negroes were levied on and seized in execution as the property of John H. Hagsdale, at the suit of Col. James Moorman, for a debt contracted long subsequent to the execution of the said deed, and sold by the sheriff of Union District, in satisfaction of the said execution, under all incumbrances, and purchased by the defendant, Thomas Booker, at the low price of $1125, and that the defendant has ever since had the said negroes in his possession. The said Booker, at and before the sale, was apprised, told, and knew of the claim of complainants to the said negroes. The amount of the debí and costs, to satisfy which they were sold, did not amount to more than $390, and this sum is all the defendant has ever paid. 1 n September, 1822, James II. Hagsdale died intestate, leaving the complainants and *350 their father, John H. Itagsdale, his heirs at law, surviving him; that about the 1st. of October following-, John H. Bagsdale died intestate, whereby all his estate and interest, as well as that of the defendant, Booker,, ceased and determined, except that part of them which John H. Bagsdale was entitled to as heir at law of Ja lies II. Bagsdale. That the defendant had threatened to remove the .negroes out of the State to evade the claim of the complainants. The bill prayed that the defendant be decreed to deliver up the negroes and settle for their hire since the death of JohnTi. Bags-dale, and that partition be made of them among the complainants.
It was in proof that J ohn H. Bagsdale had four other negroes, and was entitled to a considerable estate in Virginia, which he subsequently received, besides $700 in cash at the time of the sale, and that he owed but little. It was further in proof, that Booker knew of the deed from J ohn H. Bagsdale to complainants, and that he contracted with said Bagsdale, to purchase in his life estate for $600, and was to purchase in the negroes, let them sell as high as they might. It was farther in proof, that Booker said he had piurchased the negroes to befriend Ragsdale, and that the claim of the complainants was generally known. For the defendants, it was contended that this deed from John H. Bagsdale should be set aside, inasmuch as it was voluntary. Voluntary deeds have always been considered valid between the parties, and all persons claiming under them; and void only as to creditors. In the present case, *351 it does not appear that the donor was in debt, or, if he was, he had an abundance of property to have paid what he owed. That the defendant was well acquainted with all the facts of this case, and purchased with his eyes open, at a price exceedingly disproportionate to the value of the negroes.
It is, therefore, ordered and decreed, that the defendant do deliver up to the complainants the negroes in the bill mentioned, and that he do account before the Commissioner for their hire since the death of the said John H. Ragsdale, and pay the costs of this suit. It is further ordered and decreed, that the-said negroes be divided among the complainants according to their respective rights.
Defendant appealed—
1. Because the Chancellor ought to have dismissed the bill with costs, as eomnlainants have a plain and adequate remedy at law.
2. Because the case made by the proof, and on which the decree is predicated, is entirely different. from that made by the bill, and, therefore, defendant was surprised ; that evidence was objected to.
3. Because the deed, under which complainants claim, was a testamentary paper, and vested no legal interest in the complainants until the death of John H. Ragsdale, the donor.
4. Because the deeds were fraudulent and void against all creditors, as well subsequent as existing, as a party cannot, by deed, give a life estate to one in personal property, with a limitation over to another.
*352 5. Because the decree goes too far in favor of complainants, in declaring that they are entitled to the whole of the negroes, as the defendant is, at all events, a joint tenant with complainants, and the decree ought to have ordered a writ of partition.
6. Because the decree makes the defendant pay the costs, when it is manifest that if the court has jurisdiction of the case at all, it is only on the ground that there must be a partition between the complainants and defendant, and in such cases the court never orders defendants to pay costs.
Clendinen & Thomson, Defendants’ Solicitors.
Curia, per Nott, J. — The court do not deem it necessary to go into a consideration of any of the grounds of appeal taken in this case, except the third, which is in the following words — “ Because the deed under which the complainants claim is a testamentary paper, and vested no legal interest in the complainants until the death of John H. Ragsdale, the donor.”
Judge Blackstone definesa testament to be “ the legal declaration of a man’s intentions which he wills to be performed after his death.” Other writers have adopted the same definition. The paper under which the complainants profess to claim, is precisely of that character. The donor gives the property at his death ; it is in consideration of love and affection; he makes an equal division among all his children, and revokes all other gifts and bequests. *353 It does not profess to have been delivered. An essential distinction between a will and a deed is, that one is to take effect at the death; the other, immediately. One takes effect upon due execution without delivery. To the other, delivery is indispensable. This paper, therefore, possesses all the essential ingredients of a will. It wants some of the necessary requisites of a deed. The right of property was not changed. It still remained the property of the donor, and was subject to his debts. The complainants, therefore, can have no right of action.
*352 2 Bl. Com. 500. Stich. on Wills, 3.
*353 The decree must be reversed, and the bill dismissed witheosts.
Colcock, J. & Johnson, J. concurred.

Decree -reversed.

•Executors of Moses Duke v. Seth Dyc&es.
An instrument of writing by which the donor, reserving to himself a life estate, gave certain slaves to his daughter, in the following words: “I have given and granted, andbythese presents do freely give and grant,” &c., and which was executed with all the requisite formalties of a deed, was sustained as -a .deed by the Court; *354 Personal property can be limited over by deed to take effect after tlie termination of a life estate in the same.
Meses Duke, the plaintiff’s testator, in his lifetime, made a deed of gift of certain negro slaves to Esther Benson, his illegitimate daughter, now the wife of the defendant, reserving a life estate to himself. After his death the defendant took possession of the ne-groes. An action was brought for their recovery by the executors, and a nonsuit ordered on circuit, on the ground that the plaintiffs showed no title in themselves. The case was heard, on appeal from this order, at Columbia. December Sittings, 1829, and the following is the, opinion of the Court of Appeals :
Non?. J. Moses Duke, the plaintiff’s testator, in his lifetime, made a deed of gift of the negroes in question to Esther Benson, his illegitimate daughter, now the wife of tho defendant, reserving a life estate to himself. After his death the defendant took possession of the negroes. The copy of the deed of gift is as follows:—
“ To all to whom these presents shall come, I, Moses Duke, do send greeting. Know ye that I, the said Moses Duke, of Barnwell District, in the State of South Carolina, for and in consideration of the love, good will and affection which I have and do bear towards my loving daughter, Esther Benson, of the same place, have given and granted, and by thése presents do freely give and grant unto the said Esther Benson, her heirs, executors and administrators, one certain negro boy slave, named Arthur, and one negro girl slave, *355 named Jane, to be and remain as ber proper right and property after the death of the said Moses Duke, or at any time previous thereto, if the said Duke shall think fit to do so. But it is the true intent and meaning of the said Moses Duke, that if the said Esther Benson shall die without lawful issue, then the said negroes, viz: Arthur and Jane, shall go to the lawful heirs of the said Moses Duke, to be and become thereafter the rightful property of his said heirs, in as full and ample manner as if this present deed had never been made or given. And the said Esther Benson the said property shall and may hold, upon the terms and conditions above mentioned, as her proper goods and chattels, without any sort of reserve whatever. Witness my hand and seal this 4th' day of August, in the year of our Lord, one thousand eight hundred and four, and in the 29th year of American Independence.
Moses Duke. [l. s.]
1" Signed, sealed and delivered in the presence of, J. Hughes and
Micaj ah Hughes.” And the only question now submitted to us, is whether personal property can be limited overby deed to take effect after the nation of a life estate. It was formerly held that no such limitation could be made, either by deed or will; but a gift for life, or even for a day, carried the whole estate. The first deviation from that rule was by way of distinction between the gift of the use of a thing, and a gift of the thing itself. Since those decisions the distinction *356 between the use and the thing itself has been laid aside, and a gift of the chattel itself, for life, is-considered as a gift of the use only. But it is contended that those decisions apply only to executory bequests by will, or to trusts, and not to cases where the property is given immediately by deed. And I do not know that such a ¿imitation by deed has ever been held good vn England ; neither do I recollect any modern decision where the contrary has been held. And it now remains for this Court to decide whether that distinction, between deeds and wills, is still to be maintained, or whether it is now-time to lay aside that distinction also, or rather whether any such distinction has ever prevailed in this State. And I would here remark that the invasion of the com/man law principle, in England, has not been by legislative authority, but by the Courts alone. And if a gift by will for life conveys nothing but the use, why may not the same words in a deed have the same operation ? If the Courts have the power in one case to effect such a change, as being more consistent with reason and common sense, and more consistent with the intention of the party, why may they not in the other 1 I am not, however, friendly to that kind of judicial legislation which am thorizes Judges to innovate upon an established rule of law, because they think it is time that it should be changed. And if I found the current of decisions running against the principle which I am advocating, I should feel bound to go with them. But I have already remarked that it is a subject on which the late English authorities *357 are almost silent, and on which I think I shall he able to show that I am well supported by the decisions of our own Courts. I mean, however, to confine my remarks exclusively to the species of property now under consideration. For although, by our law, slaves are considered as personal estate, yet we have, in various respects, made a distinction between that species of property and other personal chattels. The limitation over of a female slave, has been held to carry with it a limitation over of the offspring born during the life estate, which is not the case with any other animal. The conversion of a female slave to the use of a person, renders the party liable for damages, to the amount of the value of the issue, born during the time of the possession, as well as the value of the mother, contrary to the rule in case of female brutes.
*355 lFearn26;l Mad. Ch. 223. supra; ü^¿e^mpa1’ aj_ d 500; Tessin v. Tessin, do. 651 ’ J?wal v'
*356 t Fearn, 241,
*357 And in the case of * Geiger v., Brown, decided at our last Court, we held that a bequest of a female slave for life, without any limitation over, carried only a life estate, and that the slave and her issue, at the terminatinn of the life estate, were unbequeathed assets in the hands of the legal representatives, for which the administrators might maintain an action. We have thus given to this kind of property attributes of realty which do not belong to other personal chattels. And to hold it not capable of limitation over after a life estate, would he inconsistent with the character which has been ascribed to it by the whole current of our decisions. But the question is not left to inference. It is supported by the express opinions and direct decisions of our Courts. In the case of Dolt v. Cunning- *358 ton..it is said, “ It cannot be denied that in many cases fersonal chattels or terms for years, may be limited over, either by executory devises, or deeds, as effectually as real estate, if it is not attempted to render them unalienable beyond the duration of lives (in being,) or twenty-one years after. And although in, that ease it was held, that the property vested in the first taker, yet it was on the ground that the limitation was too remote, and not that a limitation over after a life estate, was not good. On the contrary throughout the whole argument of the Courtit is manifest the limitation over would have been supported, if it had not gone so far as to create a perpetuity. In the case of Stockton v. Marlin, similar language is used. And. although in that case, also, it was held that the contingenoy on which the property was to go was too remote, being after an indefinite failure of issue, yet it was on that ground and on that alone that the limitation was not supported. In the case of Tucker v. the executors of Stevens, ^he question was directly decided. That was a deed of gift of a brother to his sister for life, with a limitation over to such issue as should be living at the time of her death, and the Court supported the right of the children under the deed. That was indeed only a Circuit decision, and therefore cannot be relied on as a binding authority. But it was the opinion of a very able and learned Chancellor, whose opinion is always of high authority, and the acquiescence of the counsel is evidence oí the prevailing opinion of the bar. We are supported, then, by the opinions of the highest tribunals of the *359 country from the year 1794. And those not expressed as mere speculative and doubtful opinions, but as the settled principles of law. And those successive opinions, from such sources, for such a length of time, though not expressed in the most solemn form, ought now to be considered as conclusive authority upon this Court. I concur therefore in the opinion of the presiding Judge on the effect of this deed. I have" not entered into the inquiry whether it may not be supported upon some other construction. For the view which I have taken of it covers the whole ground, and if correct renders it perfectly immaterial whether it is not susceptible of some other construction which would lead to the same conclusion. I am of opinion that the plaintiffs shewed no title in themselves, and that the non-suit was properly ordered. The motion must therefore be refused.
*358 1 Bay, 453.,
See p. 456.
2 do. 471:
4 Des. 532.
*359 Colcock, J. and Johnson, J. concurred.

Motion refused.

*Bardolph Geiger et al. v. T. J, Brown.
The bequest of a female slave for life, without any limitation over, carries only a life estate, and the slave and her issue, at the termination of the life estate, are unbequeathed assets in the hands of the legal representatives of the testator, tor which they can maintain an action.
*360 Before Gantt, J. at Newberry, March Sittings, 1827.
The following is his Honor’s report.
Gantt, J. Trover to recover the value of a negro woman, Lucy, and-her five children. The plaintiffs claimed under a limitation in the last will and testament of Harmon Geiger, dated in 1778, and the case seemed to depend upon the construction of the first and last clause of the will. The inspection of the will by the Court of Appeals, is necessary to determine on the correctness of the judgment pronounced upon it by the presiding judge. The bequests to the wife in that part of the will intended for her benefit, were considered, (see the first clause) not as so many several independent sentences, whereby an inference might be drawn, that the negro Lucy was given absolutely to the wife, but that the whole was to be ■considered as one sentence, and subject to the restrictive words in the conclusion, “for her natural life.” By the last and residuary clause of the will, it will be seen that there is a specification of certain negroes, &c., not before disposed of; these, together with all the rest, &e., of the testator’s personal estate, are given to his foivr children; the division to be made on their coming of age, or marrying, &c. Whether the reversionary interest in the negro woman Lucy passed by this clause of the will, to the children, became a question of importance, and I was of opinion, and so decided, that such interest did pass. I will briefly state some of the grounds of that opinion. *361 A paramount rule in the construction of wills is, that the same be made with reference to the whole will, and to be grounded upon a consideration of the reciprocal bearings of all the component parts. Words are to be construed so as to effectuate dispositions, and to avoid intestacy. If therefore the view taken by the presiding Judge be correct, that only a life estate passed to Mrs. G-eiger in the chattels bequeathed to her, then there remained an interest which was not disposed of by that clause of the will.
That interest I considered as embraced by the residuary clause, and that it became a vested interest in those who were to take under it. In the ease of the Countess of Bridgewater v. The Duke of Bolton, Lord Holt said “suppose a man give some of his personal estate away by will, and in the same will give the residue of his estate, this will pass the rest of his personal estate.”
In Roberts on Wills, it is said “the words rest, residue, and remainder, are not to be considered as mere words -of relation, when the question is what is included under them, for it is clearly settled not only that property of the testator not before mentioned by him, will pass under the residuary devise, but property not distinctly in the contemplation of the testator at the time.” So in page 440 ; “where a testator makes a partial disposition of his interest in a thing, whether it be a chattel or hereditament, and afterwards devises or bequeaths the rest, residue and remainder, then these words may properly be considered as having a specific relation to what has gone before, *362 and standing in this light, they seem to have been always held to carry the whole of the testator’s remaining interest.”
*361 Vol, 1, 438.
*362 The defendants made a motion for a non-suit, on the grounds.
1st. That under the will of Harmon Geiger, the widow, Mrs. Geiger, took an absolute estate in the negro Lucy, and that therefore the plaintiffs could not sustain their action.
2d. That if under the will the plaintiffs could claim as remainder-men of the increase of Lucy, yet that was only an equitable estate existing between them and Mrs Geiger, and was defeated by the sale of Lucy before she had increase.
3d. That the plaintiffs cannot maintain this action, as heirs or legatees of Harmon Geiger deceased, the whole of his personal estate being by operation of law vested in his executors or administrators, and that therefore the plaintiffs could have no right to sue.
4th. That if the plaintiffs claim as legatees they should have shewn the assent of the executors to the legacy, which they failed to do.
5th. The defendant is a tenant in common with the plaintiffs, and therefore they could maintain no action against him.
His Honor overruled the motion for a non-suit, for the reasons assigned in his report, (which see.)
*363 The defendant called no witnesses, and rested Ms defence before tlie Court and Jury, upon the grounds,
1st. That the plaintiffs by their demurrer having confessed the defendant’s special plea, the defendant was entitled upon that plea to a verdict.
2d. That the tenant for life having at least in 1789, sold an absolute estate in the negro woman Lucy, thereby forfeited the estate for life, and the rights of those in remainder to the possession of the chattel instantly commenced, and that therefore the plea of the statute of limitations ought to protect the defendant.
3d. The rights of plaintiffs (if any they have,) being in remainder, were entirely equitable, and, therefore, the fact that the defendant was a purchaser for valuable consideration, without notice, ought to protect him.
4th. That the identity of the negro was not established.
5th. That the defendant was a tenant in common with the plaintiffs, and therefore the Jury could not give entire damages for the conversion of the chattel.
The case was argued before the jury on the evidence, and a verdict was found for the plaintiffs.
The two first grounds in the notice annexed, I consider as embraced in the construction which was given to the will. For myself I can draw no discrimination as to legal right between Lucy and her children. If the plaintiffs have a legal right to sue for Lucy, they are entitled under the same clause in the will to her children; *364 the estate conferred was a legal estate, and became vested by the death of the testator, and the right cognizable in a Court of Law.
The 3d and 4th grounds may also be considered as identified. That the executors have a right to the personal estate, &e., and that their assent be necessary to entitle legatees to take possession, &c, there can be no doubt, but the answer to these objections is, that the negro woman Lucy went into the possession of Mrs. Geiger, and remained with her till sold by her husband Slappey. This possession and after disposition is irrefragable proof at this distant day of assent on the part of the executor; what other interpretation can be put after a lapse of 47 years ? An implied assent is as effectual in law, as where it is expressed.
On the 5th ground and its accompanying ramifications, I have only to remark that no issue on pleadings which the case furnished was brought to the notice of the Court. I considered the counsel engaged, as trying the ease on the plea of the general issue. What my opinion might have been, on particular points, bad it been sought after, I am not prepared to say. The special plea said to have been filed, and demurrer thereto, I know nothing about.
Whether the life owner, or those claiming under her, having granted a larger estate than she was entitled to under the will (if such was the fact) might not thereby have forfeited all right under the will, and entitled those in remainder to immediate possession, and a remedy to that end either in Law or Equity, or both j and *365 whether a failure to prosecute such right on the part of those in remainder, after a right of action accrued, might not enable a bona fide purchaser for valuable consideration to plead in bar the statute of limitations, are matters on which I was not called on to give any opinion. I confess, however, the case ostensibly was a hard one, against the descendant of a fair purchaser, without notice; the claim too had a east of staleness, from the great lapse of time which had intervened from the sale of Lucy by Slappy, to the time the action was commenced. Something of the kind I suggested to the Jury, and I distinctly told them that the plaintiffs had no right to recover more in this action than for one moiety of the value of the negroes &e., for although they might be entitled to the other moiety, yet that under the residuary clause in the will they had only a vested interest in a moiety. To that extent only could they be considered as holding by purchase.
I will not weary the patience of the Court by further comment, as the ease may likely undergo a full developement by the counsel engaged in it, and I should feel reluctant to forestal the 'pleasure which the court will derive to itself, from the enlarged explication which the argument before them will furnish.
Copy op Will.
“First, I bequeath unto my loving wife Margarett G-eiger one negro boy named Joe, one negro wench named Lucy. Item, I bequeath unto my wife one sorrel mare Lady, with her saddle and bridle. Item, one brown cow and one black heifer. Item, all my *366 household furniture and the increase of the said negroes, during her natural life. And to my son Randolph Geiger, I bequeath all my lauds, to him and the heirs of his body, and if he should die without issue, the said land shall be sold and equally divided among my three daughters Elizabeth, Ann Mágdelen, Margeret; and my four negroes Jim and negroe Tom, with the remainder of my personal estate, shall be kept together for the use and maintaining of my children till any one of them arrives to age, or is married, and then my personal estate shall be equally divided amongst my children.”
The defendant appealed and moved the Court of Appeals, first, for a non-suit, on the grounds.
1 st. That under the will of Harmon Geiger, the widow, Mrs. Geiger, took an absolute estate in the negro Lucy, and therefore the plaintiffs could not sustain their action.
2d. '1 hat if under the will the plaintiffs could claim as remainder men of the increase of Lucy, yet that was only an equitable estate existing between them and Mrs. Geiger, and was defeated by the sale of Lucy before she had increase.
3d. That the plaintiffs cannot maintain this action as heirs or legatees of Harmon Geiger deceased, the whole of his personal estate being by operation of law vested in his executors or administrators, and that the plaintiffs have no right to sue.
4th. That if the plaintiffs claim- as legatees, they should have *367 shewn, the assent of the executors to the legacy, which they failed to do.
6th. That the defendant is a tenant in common with the plaintiffs, and therefore they could maintain no action against him.
And failing in that, for a new trial, on the grounds,
1st. The plaintiffs having confessed, by their demurrer, the defendant’s special plea, the defendant was entitled upon that plea to judgment.
2d. The tenant for life having at least in 1789, sold an absolute estate in the negro woman Lucy, thereby forfeited the estate for life, and the rights of those in remainder to the possession of the chattel instantly commenced, and that therefore the plea of the Statute of limitations ought to have protected the defendant.
3d. The rights of the plaintiffs being in remainder were entirely equitable, and therefore the fact that the defendant was a purchaser for a valuable consideration, without notice, ought to have protected him.
4th. The evidence objected to by defendant, on the trial, was inadmissible and ought to have been rejected.
6th. The identity of the negro was not established.
6th. The Jury had no right to give entire damages for the conversion of the chattel, inasmuch as two of Harmon G-eiger’s children who survived him, were dead, and their rights were not before the Court.
*368 7th. The verdict is contrary to law and evidence.
Caldwell and O’Neall, for the motion.
Bauskett and Butler., contra.
Curia, per Colcock, J. In this case the Court indulged the learned counsel in the re-argument of some of the points which had been determined on this very will, and in relation to the same subject ; that is, to some of the negroes, the issue of Lucy, the title to which was precisely the same as that of the slaves in the former suit. But as we have not been induced to change our opinions, as formerly expressed, it would be a work of supererrogation to go into any further or other reasoning than that which is contained in that opinion. We still think that a life estate only was given, and that the reversionary interest after the determination of the life estate did not pass by the residuary clause, and we also think that the statute of limitations must operate.
But a new point was made, which demands some attention. It is contended that although the property is given for life, that yet as it was a gift of personal property, it was an absolute gift, or must so legally operate. This is a doctrine which, I take it, is as well settled as any which has come before us at this sitting ; at least it is so as it regards negroes, which are the subject of the present dispute; that they may be limited over after the determination of a life estate, has been decideded a thousand times. And if so, it follows as a matter *369 of course that a reversionary interest may be created or exist. Once admit the doctrine of creating different estates in a chattel, and it follows, as the shadow follows the substance, that there must be, in some cases and under some circumstances, a reverter to the representative of the donor. If you admit the idea that a gift for life, of a chattel, is good to support a remainder, why not to support a reversion? and there is scarcely a book which treats upon the subject which does not shew that the old distinction between real and personal property, in this respect is done away with, in gradual progress of this doetrine. A distinction was first made between the use of the thing, and the thing itself. But this distinction was soon found to be too ethereal for the practical purposes of life, and as personal property became more valuable, and a description of it introduced among us more durable and continuing in its nature, it was at length abolished, and now it is clear that (at least as regards chattels which are endurable in their nature) any such contingent interest may be created which can be in real estate ; and notwithstanding the strong language of the counsel to the contrary, this is supported by even the English authorities. What is a term of years but a chattel, to be sure technically called a chattel real, a chattel endurable in its nature. Now as to these Mr. Fearne expressly says that when granted for life they may on the death of the tenant for life revert to the representatives of the donor ; (see page 486, who the case thus. “Where A, possessed of a term for *370 99 years, devised it to B. for life, and then to C, for life, and so on to five others successively for life ; after the death of all seven, upon the question, who should have the residue of' the term, it was adjudged to revert to the executors of the testator.” jhe motion therefore is dismissed.
Nott, J. and Johnson, J. concurred.

Motion refused.

John O. Harris v. Nathaniel Saunders.
An instrument of writing, duly executed as a deed, by which a party deceased had, in his life-time, given a slave to his illegitimate son, reserving to himself a life estate, and which had been exhibited by the deceased, and declared by him to be a deed, although retained in his hands and subsequently lost previous to his death, was held, to be a deed of which there was sufficient delivery, and not an instrument which was testamentary and revocable.
There is no prescribed form for the delivery of a deed; if it appears from all die facts and circumstances that the gift was complete, without any conditions or qualifications annexed, and without any thing more remaining to be done, it is a valid delivery, and a perfect deed, although left in the hands of the donor.
Any act of the defendant inconsistent with the plaintiff’s right of possession, or subversive of his right of property, is a conversion.
*371 Before Earle, J. at Edgefield, Fall Sittings, 1835.
His Honor reports as follows.
Earle, J. Trover for a negro. The plaintiff is the illegitimate son of John Harris, and claimed the negro as a gift from him. It was deposed by James Carson, that he drew a deed, from John Harris to the plaintiff, for a negro hoy named Andrew, about April, 1825, reserving a life estate to himself. He died in 1826, and the witness administered on his estate; Harris having retained this deed in his possession, witness searched diligently among his papers, and not finding it, applied to such of his friends as he supposed likely to have it; not being able to find it, he proceeded to sell the negro, with the rest of the estate. The defendant married the widow of Harris. The plaintiff was then a minor and had been living with Harris. He was not present at the execution of the deed, which was at the house of the witness, and it was carried away by Harris. Thinks the reservation of the life estate was made in the deed itself.
At the sale of the estate, the negro was purchased by one Hora, who sold him to Miller; he to Saunders, and Saunders to Hollings-worth, before the action was brought; and this was the only conversion ; Hollingsworth having carried him out of the State. The execution and contents of the deed were further proved by the subscribing witness. To his brother the deceased said, a few days after the execution of the deed, <:that he had deeded Andrew to John 0. Had he dono right or wrong?” His brother replied *372 “you have done right;” and he pulled out the deed and read it to him. Plaintiff was living with the deceased at this time; and also at the time of his death. To another witness, he said in the Fall of 1824, he had a mind to do something for John C., and had a mind he would give him a negro. In the Fall of the next year, he said to the same witness that he had made a deed of Andrew to J ohn C. and it was at home in his desk, and he intended in the course of a few days, to go and have it put on record at John Simpkins’ (who was the Ordinary.) To another witness, shortly before he died, on the 1st. January 1826, he said, patting the boy Andrew on the head. “This hoy I have given to J ohn 0., and I had a deed for it, but I believe it is destroyed, for I have looked and can’t find it; 1 believe my wife has destroyed it; but I mean to have another drawn, and put it on record, and when I am dead he may find it in the Ordinary’s office at Egeficld.”
A motion for non-suit was made, on the ground that there was no conversion. I thought the sale by Saunders before action brought, after the right of the plaintiff accrued, although he had no notice of his claim, a conversion. I considered the existence and loss of the deed sufficiently proved, to admit parol evidence of the contents.
I supposed the main question to be, whether the gift was complete, by the delivery of the property, or what would have been equivalent, a delivery of the deed, and this question was submitted to the jury. I charged the jury that there was no prescribed formula for the delivery of the deed; that if it appeared fro n all the facts and circumstances, that the gift or contract was complete, with *373 out any conditions or qualifications annexed, and -without any thing more remaining to he done, it was a valid delivery, and a nerfeot deed, although left in the hands of the donor. In this case, the donee was a minor ; there was no guardian, legal or natural, as he was illegitimate. And I recommended the jury to consider whether the donor had subsequently regarded the title transferred to the plaintiff, and whether he had exhibited the deed, and spoken of it as a perfect instrument. I thought the delivery sufficient, hut left the question to the jury.
I did not consider the deed, if duly executed, revocable, nor that there was any proof of revocation ; nor could I regard the defendant as an innocent purchaser without notice, entitled to set aside the deed, as voluntary and fraudulent.
On the 5th ground taken, I do not perceive how that question could be made, in this Court and before a jury. There may be merit in it, if it should appear on the settlement of the administration, that the plaintiff has received a,gift of more than one fourth of the estate, and he may be enjoined until that settlement is made. The measure of damages, as I understand the evidence, was the value at the time defendant sold him, and interest on it.
The jury found for the plaintiff, and the defendant appealed on the grounds annexed.
Grounds for non-suit. That there was not a wrongful conversion of the negro in question, and that trover will not lie upon the case stated and proved by plaintiff.
*374 Failing in. this, then for a new trial.
1. Because the loss of the deed, was’not sufficiently proved to authorize secondary evidence of its contents.
2. Because the deed, thoug i signed and sealed, was retained by John Harris, and never was delivered.
3. Because the deed was revocable, and the loss or destruction of the deed by John Harris, his offer to sell the property within a month of his death, and his death without making any other disposition of the negro, was evidence of a revocation, and this question should have been left to the jury by the Court.
4. Because possession not accompanying the gift it was fraudulent as to defendant, an innocent purchaser without notice.
5. Because the negro recovered was worth more than one fourth of donor’s estate.
6. Because the measure of damages should have been the value of the slave at the time defendant sold him.
7. Because the presiding Judge mistook the law in charging the jury, that the question of delivery of the deed was a question of intention on'the part of John Harris, that if John Harris intended that the deed should be complete and effectual, although no delivery had been made or any thing equivalent done, yet the deed should be regarded as complete, and enure to the benefit of plaintiff.
Bauskett, defendant’s attorney.
Wardlaw, contra.
Cwia,per Earle, J, The first question on the motion for non- *375 suit is, whether there was any conversion by the defendant to sustain the action. And I apprehend it will only he necessary to inquire what constitutes a conversion, to afford a satisfactory answer to the question. A conversion may arise either by a wrongful taking of the chattel, or by some other illegal assumption of ownership, by illegally using, or by misusing it; or by a wrongful detention; perhaps more accurately defined by another writer thus; a conversion seems to consist in any tortious act, by which the defendant deprives the plaintiff of his goods, either wholly or but for a time. Any act of the defendant inconsistent with the plaintiff’s right of possession, or subversive of his right of property, is a conversion. Here the do-fendant, after the accrual of the plaintiff’s title, and right of posses-1 cion, having the slave in his own hands by purchase from one who had no title, sold him to another who carried hinTbeyond the plaintiff’s reach, and puf the’ price'in his pocket. If this be not a conversion, and a very effectual one too, it is difficult to imagine what would eonsitute a conversion. The argument is, that inasmuch as the defendant was not aware of the plaintiff’s title, he is not liable after the sale. It is not denied that he would be liable if he had retained the property, and refused to give it up. Can the sale make any difference, when he thereby made property of him, and has the proceeds in his pocket? The sale was _ an act by which the plain-1 tiff is wholly deprived of his property ; and it was not the less his property because the defendant was not aware of his title, and purchased from another. If the defendant is not liable, the plaintiff is *376 without redress, as the former holders stand on the same footing. But there is no weight in the objection. If authority were needed to support the position, it may be found in Cooper v. Chitty, where the sheriff levied on the goods of a bankrupt, after an act of bankruptcy committed, of which he was ignorant; in an action by the assignees, he was held guilty of a conversion. And in Bloxham v. Hubbard, it was held that a sale of a ship, which was afterwards lost at sea, by the defendant, who claimed under a defective conveyance from a trader, .before his bankruptcy, was a sufficient conversion to enable the assignees of the bankrupt to maintain trover, without demand and refusal.
*375 \ t ' ’ ' ' 4 149] Ft‘ ’
*376 The motion for non-suit cannot prevail. It is hardly necessary to notice all the grounds that are set down for a new trial, as they do not seem to have been much relied on. The loss of the deed was proved as fully and satisfactorily as was necessary to admit parol proof of the contents. The declarations of'the donor that he had executed it, (besides the other proof of execution) that it was lost, that he had searched for it, that his wife had 'destroyed it, together with the diligent search made by the administrator without success, furnish abundant ground for the admission of the secondary evidence.
The delivery of the deed was supposed on the circuit to present the main question. And this was submitted to the jury under instructions, with which the Court perceives no good reason to be dissatisfied. Those instructions as to what shall be deemed sufficient evidence of ..delivery, conform to. the principles laid down by *377 the most approved authorities, and I think will be supported by the adjudicated cases. And the majority of the Court is not dissatisfied with the finding of the jury on that question.
*376 1 Burr. 20.
5 Ea. Rep. 407
*377 There does not appear to be any pretext for saying, that the defendant was an innoeent purchaser, without notice, and that the gift was fraudulent as to him. He was not a creditor of the donor, during his life, and did not purchase from him. He purchased from the administrator after his death, or rather claimed under a purchase from the administrator; and is not entitled to the protection he elaims as an innoeent purchaser. Nor does there appear to be any reason for regarding the paper as testamentary, and revocable; nor for saying that there was any revocation in fact, All the evidence tends to establish the paper as a deed. It had the form and requisites of a deed ; it was executed, published and recited as a deed ; and the transaction was always referred to, by the donor, as an actual gift of the negro to the plaintiff. On all the grounds, therefore, the Court is of opinion that the defendant can take nothing by bis motion, which is dismissed.
Kent. Com.
G-antt, J. Bichardson, J. Harper, Ch. Butler, J. Evans. J. Johnston, Ch. Johnson, Ch. and DeSaussure, Ch. concurred.
O’Neall, J. absent at the argument.

ISPotion refused.